IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| COLONY INSURANCE COMPANY, | § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:16-CV-00159-BL |
| RENTECH BOILER SYSTEMS, INC., | § § § | |
| Defendant. | § | Assigned to U.S. Magistrate Judge |

## REPORT AND RECOMMENDATION

This case is an action for declaratory judgment brought by Plaintiff Colony Insurance Company alleging that it has no duty to defend or indemnify Rentech Boiler Systems, Inc. against claims asserted by the Water and Sewer Authority of Cabarrus County which are pending in the Cabarrus County Superior District Court of North Carolina. For the reasons below, the District Judge should grant Colony's motion for summary judgment and declare a judgment that it has no duties to defend or indemnify Rentech in the pleaded action.

## BACKGROUND

The Water and Sewer Authority of Cabarrus County ("WSACC") operates as a function of the General Statutes of North Carolina, providing services related to the water and sewer systems of Cabarrus County. One of the facilities owned and operated by WSACC is the Rocky River Regional Waste Water Treatment Plant, which among other things incinerates waste water as a method of disposal. CH2M Hill, Inc. is a Florida corporation which proposed and ultimately contracted with WSACC to construct a system which would reclaim energy in the process of incinerating the waste water, allowing WSACC to store and sell this reclaimed energy.

CH2M solicited bids for constructing a "heat recovery steam generator," and presented such a bid from Rentech to WSACC, advising WSACC to purchase the generator from Rentech. WSACC did so, and Rentech constructed the generator at its facility in Abilene, Texas. CH2M was obligated under its contract with WSACC to inspect and approve the design and manufacture of the generator. WSACC alleges that the generator produced and delivered by Rentech contains a number of design and manufacturing flaws, resulting in a product that would build up with ash, contained broken components, incorrect sizes, and deficient welds upon delivery, and would therefore fail to operate as agreed.

WSACC brought an action in North Carolina state court alleging breach of contract, fraud in the inducement, negligent misrepresentation, violation of the North Carolina DTPA, and breach of fiduciary duty claims against CH2M, breach of contract and express warranty claims against Rentech, and a breach of contract claim against a separate vendor unrelated to this declaratory action. Rentech had contracted with Colony for two consecutive general liability policies and two consecutive errors and omissions policies, and the parties agree which policies apply to the claims in the state court complaint. Colony believes the terms of the policies and applicable laws render Rentech exempt from coverage under the policies, and seeks a declaratory judgment to that effect here. Rentech and Colony—as the parties to this action—agreed to a modified briefing schedule in support of the instant cross-motions for summary judgment, and all the relevant issues have been adequately briefed and are ripe for determination.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 56(a) provides for a party to seek summary judgment by showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is genuine only if the evidence would reasonably support

a jury verdict for the non-moving party, and a fact issue is material if it might affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986); *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). So, in these cross-motions for summary judgment, the parties must show that they are entitled to judgment as a matter of law because the other party cannot show a genuine dispute of any material fact.

In Texas, an insurer's obligations to defend are determined under the "eight corners" rule, which considers whether the factual allegations in a complaint state a cause of action which might be covered by the policy; the four corners of the complaint and the four corners of the relevant policy are exclusively considered. *City of Coll. Station v. Star Ins. Co.*, 735 F.3d 332, 336 (5th Cir. 2013). In general, courts construe ambiguities in favor of the insured for policy reasons, but will not imagine factual scenarios or imply facts toward finding a duty to defend. *Nat'l Union Fire Ins. Co of Pittsburgh v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139 (Tex. 1997). The insured has the initial burden of establishing that the claim is covered by the policy terms, the insurer has a secondary burden to show an exclusion applies, and the insured then would have the burden of showing an exception to the exclusion should apply. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010).

## DISCUSSION

### Coverage under policy terms

So, Rentech must first show that there is at least some genuine question as to whether the terms of the relevant policies cover any of the activities enumerated in the North Carolina state court complaint. Toward that end, it emphasizes the general rule that favors finding coverage, even if such a factual scenario might be specious and unlikely. (Doc. 16, 16). Rentech also stresses that the duties to defend and indemnify are separate and must be considered individually, except if the

same reasons exist for finding no duty to defend and no duty to indemnify. (Doc. 16, 17). The parties agree that the two policies relevant to facts pleaded in the underlying lawsuit are the commercial general liability policy in effect from August 26, 2014 to August 26, 2015 and the errors and omissions policy in effect from August 26, 2015 to August 26, 2016. This analysis will deal with these policies in turn.

### Commercial General Liability Policy

The parties agree that the relevant general liability policy was in effect from August 26, 2014 to August 26, 2015. The insuring agreement of that policy reads, in part:

> Coverage A Bodily Injury and Property Damage Liability
> 1. Insuring Agreement
>     a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
>     1. the amount we will pay for damages is limited as described in [the] Limits of Insurance; and
>     2. our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.
> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.
>     b. This insurance applies to "bodily injury" and "property damage" only if:
>     1. the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>     2. the "bodily injury" or "property damage" occurs during the policy period….

(Doc. 16-1, 31). Property damage is defined later in the policy as "physical injury to tangible property, including all resulting loss of use of that property …; or loss of use of tangible property

that is not physically injured." (Doc. 16-1, 45). Rentech believes the North Carolina suit is covered by this policy, as there are some portions of the complaint which meet the definition of property damage from the policy. (Doc. 16, 19). It points specifically to references in the complaint to tubes in the generator which froze during shipping the generator from Texas to North Carolina and had to be replaced upon arrival. (Doc. 14-1, 7 ¶ 41). Rentech concedes, however, that this damage is excluded from coverage because it is part of Rentech's "product." (Doc. 16, 22).

This is because the exclusion set out in subsection k negates coverage for Rentech's product and its components, and the parties agree that is the only physical damage alleged in the underlying complaint. (Doc. 16, 22). Rentech, therefore, turns to alleging that the loss of use allegations in the underlying complaint instead may create liability covered by the policy. (Doc. 21, 9). Colony disagrees, but does not cite caselaw showing that the installation of faulty equipment causing downtime until the equipment is repaired or replaced is not property damage covered by the policy. (Doc. 14, 13).

Instead, Colony points to loss-of-use cases where an insurance company was not required to indemnify a judgment against a construction company when a house was constructed on encumbered property, a case involving misrepresentations about and physical defects of real property, and a case involving the theoretical loss of profits caused by delay in construction of an oil well based on the theory that they were economic-only harms and not property damage. (Doc. 14, 13) (citing *Great Am. Lloyds Ins. Co. v. Middlestadt*, 109 S.W.3d 784, 788 (Tex. App.—Fort Worth 2003, no pet.); *Terra Int'l, Inc. v. Commonwealth Lloyd's Ins. Co.* 829 S.W.2d 270, 273 (Tex. App.—Dallas 1992, writ denied); *Lay v. Aeta Ins. Co.*, 599 S.W.2d 684, (Tex. Civ. App.—Austin 1980)). Colony also cites a case including the most forthright articulation of this rule: "We hold that the plain meaning of the insurance contract phrase "the loss of use of tangible property"

does not include economic loss, ... based on the assumption that tangible property, unlike an economic loss, is generally subject to physical injury or destruction." *Houston Petroleum Co. v. Highlands Ins. Co.*, 830 S.W.2d 153, 156 (Tex. App.—Houston 1990). However, this reading is unpersuasive: the policy contract here explicitly states that coverage includes "loss of use of tangible property that is not physically injured." (Doc. 16-1, 45). Although an exclusion may apply, the policy by its explicit terms covers the loss of use of tangible property, even absent a physical injury to that property.

Colony believes that a number of "business risk" exclusions set out in the CGL policy preclude coverage under the facts in the state court complaint. (Doc. 14, 13). Exclusion k reads that the policy does not cover "property damage to your product arising out of it or any part of it." (Doc. 16-1, 35) (internal quotation marks omitted). Property damage is as defined earlier, and the policy further defines "your product" as any goods or products manufactured or sold by the insured and any materials, parts, or equipment provided in connection with such a good or product. (Doc. 16-1, 45). Rentech argues that the loss of use property damage alleged in the complaint is not merely to its product—the generator—but rather to the project as a whole, and therefore this exclusion does not preclude Colony from defending Rentech on at least some of the claims in the complaint. (Doc. 16, 22). Colony concedes this point, and instead argues that exclusion m prevents coverage for the impact of the generator on the project as a whole.

Exclusion m refers to "Damage To Impaired Property or Property Not Physically Injured" and excludes from coverage any "property damage to impaired property or property that has not been physically injured arising out of [a] defect in [the insured's] product or work, or a delay or failure by ... anyone acting on [the insured's] behalf to perform a contract or agreement in

accordance with its terms." (Doc. 16-1, 35) (internal quotation marks omitted). "Impaired property" is defined as

> tangible property, other than your product or your work that cannot be used or is less useful because it incorporates your product or your work that is known or thought to be defective, deficient, ... or dangerous, or you have failed to fulfill the terms of a contract..., if such property can be restored to use by the repair, replacement, adjustment or removal of your product or your work or [you] fulfilling the terms of the contract or agreement.

(Doc. 16-1, 43) (internal quotation marks omitted). Rentech details at length the Fifth Circuit's holding in *Blanton v. Continental Ins. Co.*, 565 F. App'x 330 (5th Cir. 2014) and proposes that it establishes there is a two-prong test for evaluating an impaired property exclusion, turning on whether the property is physically injured. (Doc. 21, 11-16). Rentech argues that the project as a whole is not tangible property, and so the project must instead be "property that has not been physically injured" under the exclusion. Rentech, however, does not show that the intangible project as a whole was not damaged by Rentech's alleged failures as set out in the terms of the exception. It instead argues that incorporation of the faulty generator physically injures the project as a whole, which is a theory expressly rejected by the Supreme Court of Texas.

In *U.S. Metals, Inc. v. Liberty Mutual Grp., Inc.*, 490 S.W.3d 20 (Tex. 2015), the parties were litigating whether or not a commercial general liability policy covered the replacement and repair of components of refinery processing equipment when defective flanges were welded internal to pipes, meaning the machinery could not be used absent physically cutting into the pipes, rewilding new flanges, and recoating the pipes with the appropriate chemicals to ensure safe operation. *Id.* at 21. U.S. Metals supplied the flanges to Exxon, and Liberty contracted with U.S. Metals under the general commercial policy which "cover[ed] physical injury to property and the lost use of property that could not be restored by replacing the flanges." *Id.* (internal quotation marks omitted). The Supreme Court of Texas answered questions certified by the Fifth Circuit and

held, among other issues, that installation alone of the faulty flanges did not constitute physical injury to the units, and that according to the terms of the policy, equipment that was restored by replacement of the flanges—the unit as a whole—was excluded from coverage, but that individual components that required replacement as a result of the faulty nature of the flanges—such as insulation and gaskets incorporated into the unit—were covered under the policy. *Id.* at 28-29.

So, even if Rentech is correct that there is no "impaired property" here, it must also show that there is some actual injury alleged in the complaint to be caused by its purportedly faulty generator to another component of the project. The policy excludes from coverage claims for "property that has not been physically injured arising out of [a] defect in [the insured's] product or work, or a delay or failure by ... anyone acting on [the insured's] behalf to perform a contract or agreement in accordance with its terms." (Doc. 16-1, 35) (internal quotation marks omitted). To the court's reading, the complaint alleges no second-order injury caused by the faulty nature or necessary repair of the generator as was present in *U.S. Metals*, and therefore the exclusion m precludes coverage whether or not WSACC's property qualifies as "impaired" under the definition and case law. Furthermore, the court also recognizes that it is possible to read the impaired property exclusion as relating to the tangible processing facility which is less useful because Rentech's generator allegedly does not work as agreed, and therefore the impaired property exclusion applies in spite of Rentech's characterization of the WSACC's injury as intangible.

The GCL policy by its terms, then, excludes Rentech from coverage of its product directly and the property of others that is impaired by the product. Those exclusions operate in tandem to result in no obligation for Colony to defend Rentech in the pending action and no future obligation to indemnify Rentech for any losses related to the action that may occur.

**Errors and Omissions Policy**

The parties agree that the relevant E&O policy was in effect from August 26, 2015 to August 26, 2016. Among the policy terms are these provisions:

> 1. Insuring Agreement
> a. We will pay, in excess of the [d]eductible shown in the [d]eclarations, those sums the insured becomes legally obligated to pay as damages because of an act, error[,] or omission arising out of your professional services to which this insurance applies. ...
> b. This insurance applies to claims for damages only if:
> 1. the damage arises out of an act, error[,] or omission in the conduct of the insured's professional services; ...
> 2. Exclusions
> This policy does not apply to any claim: ...
> g. Based on or directly or indirectly arising out of any actual or alleged damage to or destruction of any tangible property, including the loss of use thereof; ...

(Doc. 16-1, 120-22) (internal quotation marks omitted). Claims are defined as demands for damages arising from a professional service, and professional service is defined as the "usual and customary services of the profession described in the [d]eclarations..., including personal and advertising injury arising out of the insured's professional services." (Doc. 16-1, 128-29). An endorsement to the policy further excludes any claims

> based on or directly or indirectly arising out of or resulting from any damages ... incurred by any insured or others for any adjustment, disposal, inspection, recall, removal, repair, replacement[,] or withdrawal of your product [or] any property containing or incorporating your product..., based on or directly or indirectly arising out of or resulting from delay in delivery of or failure to deliver your service or any part or phase of your service, [or] based on or directly or indirectly arising out of or resulting from delay in performance of, or failure to begin, your service or any part or phase of your service.

(Doc. 16-1, 135).

Rentech argues that the professional services of design, manufacture, and installation of the generator are covered by the E&O policy, and Colony can be understood to have conceded the

point of initial coverage as it focuses on which exclusions might apply to the claim. (Docs. 14, 25; 16, 29). Colony offers first the endorsement exclusions, which clarifies the E&O policy does not cover repair, replacement, or withdrawal of the generator, or any failures or delays to perform professional services. (Doc. 14, 25). Rentech concedes that portions of the endorsement exclusions negate coverage for claims related to failure to provide the professional services, but contend that the portion referring to Rentech's product is a "sistership exclusion" which would refer only to other generators produced with Rentech that might be sidelined or recalled because of fear of flaws similar to those in the generator delivered to WSACC, but not exclude coverage for the generator which was actually delivered. However, following this reading would be a violation of the eight-corners rule: the endorsement to the E&O policy states in plain text that "your product means goods or products (other than real property) manufactured, sold, handled[,] or distributed by you" and that coverage was excluded for any recall, repair, removal, or replacement of such a product. (Doc. 16-1, 135-36). Without showing that the policy contract cannot be enforced against it for some reason, Rentech is bound to those terms that clearly preclude coverage for damages related to and stemming from its generator.

These exclusions, like those for the CGL, also relieve Colony of any duty to indemnify Rentech for losses on the same grounds it has no duty to defend.

**Illusoriness**

Rentech argues that if Colony's interpretations of the exclusions are accepted, then coverage under the policies, and specifically the E&O policy, becomes illusory. However, the policy contracts as written do not function to preclude all coverage, merely coverage for the claims in the North Carolina complaint. It is plain from the CGL that it would cover any number of claims

against Rentech as a business that are unrelated to its specific business, but rather vulnerabilities in the operation of any business, using premises liability as only one obvious example.

The E&O policy, as amended, covers professional services but not the product itself. Rentech would, as a mere example, be covered by the policy if it had consulted on the construction of the generator by another. As explained above, the policies intentionally foreclose coverage for the generator produced by Rentech and any claims stemming from that generator, but that does not render coverage under the policies illusory: an intentional decision to decline to cover purportedly deficient workmanship by Rentech set out in the policies is not equivalent to the policies being altogether ineffectual. Rentech has not shown that coverage would never be found under these policies as written, but has failed to show that there is any question they do not cover the allegations in the North Carolina complaint.

**Unconscionability**

Rentech also argues that it is unconscionable to hold it to the terms of the policies as written. This argument is not tenable: the lack of coverage for the claims is not the result of trickery or deceptive behavior, but rather because the policies rather explicitly would not cover physical products produced by Rentech under some circumstances. Rentech does not allege that it was unaware of these provisions before agreeing to the contract, but rather that "[i]t goes without saying that, had Rentech known that it was paying ... for a policy that does not cover anything that actually could happen as a result of its products or services, [it] never would have agreed to such terms." (Doc. 21, 23). However, that is not the case: as explained above, there are clearly claims which would fall within the coverage described by the policies. Rentech has no right to claim exemption from the contracts because it would otherwise find itself exposed to risk as a result of the quality of its product. The fact that Rentech paid a substantial premium for the policies is

evidence it should have been aware of the exclusions in the policy and supplemented with other coverage to minimize its own risk as necessary, not evidence that it is unconscionable to hold it to the contract.

## CONCLUSION

Defendant Rentech Boiler systems has failed to show, as explained above, that there is any genuine question of material fact, and conversely Plaintiff Colony Insurance Company has shown it is entitled to judgment as a matter of law releasing it from any obligation to defend or indemnify Rentech in the pending North Carolina state court action. It is, therefore, **RECOMMENDED** that Colony's motion for summary judgment (Doc. 13) should be **GRANTED**, Rentech's motion for summary judgment (Doc. 15) should be **DENIED**, and judgment be entered declaring that Colony owes no duty to defend Rentech against the claims raised in the underlying suit or to pay any judgment or settlement entered in connection to the underlying suit.

**IT IS ORDERED** that this case is transferred to the docket of Senior United States District Judge Sam R. Cummings. After that reassignment, the undersigned may continue to exercise all powers permitted by 28 U.S.C. § 636(b) unless otherwise directed by Judge Cummings.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the

aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

**SO ORDERED.**

Dated March __/__, 2018.

E. SCOTT FROST
**UNITED STATES MAGISTRATE JUDGE**